Good morning everyone. I want to thank counsel for accommodating us. This case has been moved around a bit. Matter of U.S. v. Franklin Brown. Mr. Shepard. Good morning, Your Honor. My name is Ray Shepard. I'm here on behalf of Franklin Brown, who celebrated his 83rd birthday in prison on April 28th, 2011. Excuse me. Before you start. Yes. Am I correct that his sentence terminates in January 2011, assuming there's no change? I mean, 2012. That's correct, Your Honor. His early release date is July 4th. For home confinement, is that correct? He becomes eligible for home confinement on Independence Day. That's correct. But it's not guaranteed, and we are aware of other situations where it can take months for that to happen. So it's not a set-in-stone deadline. Okay. Just a couple preliminary questions. Initially, well, if he had 90 months, he served 65. He went in back in last December, is that correct? Yes, Your Honor. That's correct. So that would be He's 71. Yes. Good time, I guess, is what, 353 days? Approximately, yes. Another year. Before he went in, I guess. That's correct. So, okay. How do we get to 90? I'm just trying to figure out the math. So it'd be 65 plus 7 is 72, plus 12 is 84, roughly. I'm six months short. Right. There would be six months of home detention at the end of that. Got it. Okay. I'd like to reserve three minutes, if I may, for rebuttal. Are you first arguing, obviously, you're arguing that there's procedural error here. Are you also arguing substantive error? Yes, but they're really related. If you look at the case law, that when you have substantial procedural errors, it often prevents the sentence that's arrived at from being substantively reasonable. That's our position. I mean, the real focus here is on the procedural error. Although it seems like what we normally do is if there's procedural error, we just remand. I mean, the Osborne case in 07 sort of hinted at that. Then you had Merced in 2010. And then just a couple of months ago, the case that Judge Jordan decided in McGroney, it seemed to say that if there's procedural error, we just sort of stop there and don't get to the substantive part. That's correct, Your Honor. And I would just say as a matter of practical ability to do justice in this case, if you find that there has been procedural error, we are requesting that you take into consideration the practical problem of time, because... Well, how do we do that? You're making a really good point, but how do we do that? We can't impose sentence ourselves. No, Your Honor. I think as a practical matter, you could remand with specific instructions. You could revisit the issue of release on bail pending that resentencing so that Mr. Brown doesn't spend that... Have you filed a motion for release on bail? Yes, we did. And that's pending now? No, it was denied. So you'd file another one after this argument? We could. I will renew it right now, Your Honor, if I may, orally. And I could certainly file a written renewal. But I think as a practical matter, if you were to decide that there were procedural error, you must recognize that by the time this case gets remanded and resentence occurs, Mr. Brown will have already served more time in prison than he otherwise should have. As of today, as we just went through the math, Mr. Brown has already served almost a year more in prison than any other member in this case. That includes Martin Grass, who... The whole was Grass, because the district court seemed to focus on proportionality and... Martin Grass is... I don't know his exact age, Your Honor, perhaps the government does, but I do know he's much younger. I believe he's in his 50s. He does not have the health problems that Mr. Brown has suffered during his time in prison. Do you dispute the relative culpability conclusion of the district court between Grass and Brown? Your Honor, the government and we both believe that Mr. Grass was more culpable than Mr. Brown. The difference between the two is that Mr. Brown has maintained his innocence from the beginning, went to trial, did not cooperate, did not... And even today has maintained his innocence, has pursued appeals. And that's really the difference between the two. But there was no... Mr. Grass's sentence was reduced by six months because he indicated that he was a drug user and participated in a drug treatment program. So Mr. Brown, who is not a drug user, has no consideration given to that whatsoever. As a practical matter, when you appealed in the first appeal, in this case Brown 1, you had three issues and the court decided only the one, that the sentencing court did not consider adequately the 3553A factors in light of Booker, because it was so new. Yes. Sent it back and said specifically you can consider, among other things, the downward departure motion. It looks like the court did not consider the downward departure motion, but seemed to take it into account the same factors that it would have had it done so in connection with the step three variance factors. So yes, it should have done the downward departure, made a decision on that, but in this case, practically speaking, does it really make any difference? Absolutely. Because, Your Honor, what you're doing is you have to guess what the properly calculated guideline range would have been had she actually ruled on the downward departure motion. I mean, this case is on all fours with Lofink that we've cited and discussed in our brief. Well, not quite. The district judge in Lofink was made it a practice of conflating the variance and departure decisions. Yeah. Other than having a routine practice that the judge stated, the practical effect is the same because in Lofink you had a situation where the judge agreed that there was some departure that was because they granted a variance and granted a below guideline sentence. And so what this court stated in Lofink is we have to guess now whether she was, or the judge in that case was, had granted or the government made the same argument that it was the functional equivalent of denying the motion because the judge went ahead and granted a variance. It's the exact same situation. Madam, Lofink would undermine your reasonableness argument because given the procedural difficulties, if we agree that they're there, given Lofink and what we said there, it makes it impossible to get to the second reasonableness inquiry, doesn't it? Well, not impossible. I believe this court does have the authority to say that because of the procedural error, we find that the resulting sentence is also substantially unreasonable in this case. And we have said that. Yes. I'm still lost procedurally. Let's say we agree with you that the court should have decided this downward departure motion. Maybe that would have given you less of a sentencing range instead of 108 months at a minimum under the sentencing guidelines. It would have been something like 90. It sounds like you might end up with 90 anyway, but the point is with the timing that you're starting on July 4, what can we do in that very short time frame that can help him significantly when no matter what he gets out next January? Well, Your Honor, I think what you could do is release him. You can do that in a number of ways. I think he's already served more time in prison than he should have in this case, frankly. Under what grounds? There's one thing that has been made very clear from the Apprendi line down through Booker and all the progeny. The district court gets a big thumb on the scale when it comes to the reasonableness of the actual sentence. Yes. Mr. Brown has never been in prison after having been through a reasonable sentencing procedure. In other words, his entire time in prison, this court found in the first appeal that the court had not properly explained or even considered the 3553A factors, and that was okay because she was not a prophet. She was a judge and Booker was brand new. This time, there was very specific instructions that this court had given over the last five years as to how to do it. Let's assume you're right, but how can we say, okay, the last six, we're going to take that 90 months and in effect make it 84. How can we say that? Well, you could find that the sentence was not, that is not substantively reasonable and that no additional time would be reasonable in this case. You could find that. That's tough though because that makes us the sentencing court. It seems to me what procedurally, if you were to win this, and who knows if you will, if you file a renewed motion for release on bail, then if we have a remand, at least Mr. Brown is no longer incarcerated. I agree, Your Honor, and that's certainly a cleaner procedural way to accomplish the same goal. My goal is to get Mr. Brown out of the Federal or to take away the sentencing function from the district court. And we could certainly renew a motion. It's hardly ever done. I agree. Another issue, we've talked about the failure to rule on the departure motion. I think our brief sets forth that pretty clearly that the government's relying on an unpublished case called Morris, wherein the court issued a sentence within the guideline range. And under those circumstances, this court said, well, you can infer that that's a denial of the downward departure motion. We know it's problematic because that's one 3553A factor. It's not all of them. Right. But I also want to have, I only have a few minutes left before I have to sit down. I want to talk about another issue that I think is really important in this case, and that is whether or not the scope of sentencing was proper in this case. Whether it was, this court's remand was a general remand. There is nothing, there is no way to read that the sentencing. Now, admittedly, in Miller, this court recognized that there was a split of authority as to whether under those circumstances that would be a de novo resentencing or not. Do you think Pepper requires a de novo? I think it comes very close because Pepper, I don't think it was directly in front of the court in Pepper, but Pepper makes very clear there's language in Pepper that says they cite. Absent a specific contrary remand from the Court of Appeals. That's right. What Pepper seems to have said is that if you have a general remand, that should be de novo. And they cite Stinson, which is an 11th Circuit case, which is in the majority opinion that says if you have a general remand, then it's a de novo resentencing. The holistic nature that Stinson talks about, this really, I mean, it makes sense. It does make sense. And to have limited Mr. Brown's ability to challenge things, look, I'm a new counsel. I wasn't his trial counsel. I wasn't even his first appeal counsel. There are issues that I believe, factual issues that should have been raised at the same amount of time. Go ahead, finish up. There were factual issues that should have been raised and challenged which affect the underlying calculation of the guidelines, which is the first step that the court has to arrive at a properly calculated guidelines range. We were not permitted to do that below. And I would point out that the government has flip-flopped on both this issue and on the issue of whether the court addressed the downward departure motion. The governments filed a motion in the district court in which they said, quote, this case was remanded by the court for de novo resentencing. Now they want to say, no, it was limited because they're trying to read something into the court's mandate that's not there. But that's very important because it goes to fundamental fairness and Mr. Brown's ability to challenge things that he should have been free to challenge. And it's also fundamentally unfair that the court allowed the government to have de novo review on an issue important to the government because they were seeking additional funds, additional fines. That part, the judge said, fine, you can have de novo review. And Mr. Brown had to submit additional documentation to update the pre-sentence report. Is it clear that the district court did not consider post-rehabilitation in the re-sentence? Absolutely. I would defy anyone to find anything in the record where the court considered that at all. I don't even know if the judge read my pre-sentencing memorandum. I'm assuming that the court did, but there's nothing in the record that says she did. And there's certainly nothing that came up at the re-sentencing hearing where she gave any consideration to that. There's no mention of that anywhere in the record. Well, it looks like she had another hearing scheduled in a hurry to finish this up. Absolutely. At least two times during this re-sentencing hearing, she made comments on the record that she had other matters pending on her calendar. She was rushed and perhaps was not happy that the re-sentencing was going as long as it did. Okay. Thank you very much. Thank you. Mr. Daniel? Good morning, Your Honors. Kim Douglas, Daniel for the government. Let me start off with the downward departure. Specifically, that was explicitly stated by our court on the remand that while we didn't deal with that, the district court can deal with that on remand. So, that's explicit. So, whether you get into the de novo versus limited remand, it doesn't make any difference here. That went back and the court did not deal with it. I mean, I used to say back where I grew up, ain't no doubt about it. So, what are we supposed to do about that? The downward departure, Your Honor? Yes, sir. I respectfully disagree with you. Where did she deal with it? She dealt with it when she said that she was accepting the guideline range as reported in the pre-sentence report. That doesn't go to the departure, though. No, that's step one. The guideline range is step one. Step two is you take the guideline range and you say, okay, there's reasons here that you should have other guidelines applied, either up or down. In this case, down. And accepting the PSR doesn't deal with that at all. First of all, we're guessing that it might deal with it if she actually meant that. She never said that, but she's really talking about step one, not step two. But, Judge, I think in taking in context of what had happened, we took testimony and evidence on the departure motion. She then heard argument from counsel on the departure motion, took a recess, came back out, and announced to the courtroom that she was accepting the guideline range as reported in the pre-sentence report without change. In that context... Yeah, but that doesn't really answer the question. You accept the guideline range without change. That is step one. There's still an issue about that's one of the 3553 factors that determines where the court is going to start the reasoning from. Once you accept the guideline change, that gives you, that sets the benchmark. But there's an issue here about whether or not that benchmark is appropriate. Whether it should be adjusted. Whether it should be adjusted to step three. We have to guess at that. What the judge further said, Your Honor, I think also clarifies what she did. She starts off by saying, I'm accepting the numbers as reported without change in the context of just having an argument on the motion for departure. It was implicit that what she was doing was denying the departure motion. But she never said, I deny the motion for departure. All she said is, I'm dealing with this as a variance. And if that's the case, if she took the departure issues and dealt with them as a variance, then we really do have a loafing problem, don't we? That's true. She did not specifically say those words in connection with the motion. But what this case is like, then, is like the two other cases we talked about in our brief, Rita and Maurice. Well, Maurice is non-presidential. I mean, it's an NPO. Rita was another case I believe was a published case. Again, not express words, but from the context of what was said and done, it was clear what had happened. And beyond that, she then goes on in her statement of the reasons portion of her sentence to use the word variance on at least three. She clearly used variance on that step three. Right. Where she committed procedural error here and violated Glynther is that she did not allow oral argument after she made the ruling on the departure motion on the 3353 Act. Again, I'm not sure she made a ruling on the departure motion. I think she was in a hurry and she just said, I'm going to accept the PSR. And one sentence, I mean, first of all, if she's going to accept the PSR, okay, that, again, deals with step one. Then she has to say, I've considered your motion for departure and I'm denying it for this, this, and this reason or whatever reason she wants to give. She doesn't, there's no statement in there of that second. No doubt about it. She wasn't that expressive in saying exactly what she was. And if she had done that for some of the reasons that she later gave with regard to the variance, then we don't even have jurisdiction over that particular issue. That's true. But you have to deal with it. Otherwise we don't know what's, you know, we have to have something to review and that's the extent of it. Another problem here, the reasons that she did give are frankly, I'm scratching my head because she said that the court believes the Federal Bureau of Prisons can continue to competently meet all of Mr. Brown's medical needs. And how she could determine from the record before her that the Federal Bureau of Prisons had competently met Mr. Brown's medical needs, I'm shaking my head saying she couldn't have meant that. Because Ramirez got up and said, no, we can do this, we're not surprising because he's the guy in charge of doing it. But then in cross-examination he admits that coumadin levels were not checked and the Bureau of Prisons violated its own policy in not checking coumadin levels. He saw a cardiologist twice in five years. And so how she can say they can continue to meet his medical needs, Ramirez's own statements in cross-examination would really establish, it seems to me, that they weren't meeting his medical needs. But even if they were under 3553-4A, I guess it is, A-4, she didn't ever address whether or not there are better ways of meeting his medical needs, more efficient ways of meeting his medical needs than confining him in an institution which for the past five years had not done those things which they need to do for someone of that age and in that health. And the other thing which really bothers me, she is so focused on proportionality with Grass. She says that the sentence is six months longer than that which was given to Grass. Unlike Brown, Grass pled guilty, accepted responsibility. If Grass and Brown were identically situated, it makes sense in terms of proportionality analysis to say, okay, one guy pled guilty, one guy went to trial, I'm going to cut a break to the guy who pled guilty and accepted his responsibility. And this is, obviously, we have to ignore Mr. Shepard's argument that his client is maintaining citizens. But they're not similarly situated. You got a guy who, if the shout out earlier was accurate, he's in his mid-50s, and we've got a guy who is substantially older than that. So how can you take those two defendants and say, well, they're similarly situated, I've got to give one guy more time. In theory, not in theory, you can make a very strong argument that if you give them both the exact same amount of Brown's period of incarceration, because he's so much older. So you give him the same, that's, clearly, the judge does not have to do that, it's up to her. But to ignore the fact you got two very differently situated defendants here and try to impose a proportionality analysis, it really is apples and oranges. Brown is not Grass though, he's much, much older. So how can you say that, well, I'm giving Brown a little more time because he doesn't accept his guilt, without going through then the parsimony analysis, which is required under Wolofsky, and concluding that this is the least serious sentence that can be given consistent with the purpose of the sentencing. That's nowhere on this record, and I don't know how you can make that conclusion on this record. How can one say that there's no shorter sentence that would meet the same needs of sentencing? I don't know how you get there. I don't know if that's a question or what happened here. Well, Your Honor, if I can maybe shed some light on the relative culpability. We've always said that Martin Grass was the most culpable because he was the chief executive officer of the company. He reported no one else except the board of directors. For that reason, in our estimation, he was slightly more culpable than Franklin Brown. But Franklin Brown was very close in culpability. In fact, if there was a leader of the obstructionist part of this crime, the tampering with the witnesses, the coaching them on how to testify, that was Franklin Brown. He was the center of the conspiratorial wheel. Yeah, but he's clearly paid dearly for that, and the issue is whether or not the sentence that was imposed was, at least on the mean man, procedurally reasonable, and then possibly, if we get to the substantive reasonableness. I go back to the Court's earlier concern about whether or not there was evidence to Brown's medical needs. Well, she said they had met. Maybe they could. And they had. She said they had met. The fact remains, Your Honor, that since Mr. Brown was moved to the federal medical facility at Butner, he never had any additional hospitalizations or real serious medical issues thereafter. They effectively managed his health care. In fact, his own doctor admitted that he had been stable since he'd been moved to Butner in 2006. How long was he in before he was moved to Butner? He was at FCI Schuylkill for about three years. I'm not exactly sure. He had one hospitalization there. They put him in the Hershey Medical Center for a week or two. He was then sent to Butner, and at Butner he came under more closer medical monitoring. By a cardiologist? By consultation with cardiologists as needed. Well, but the determination as to when the cardiologist is needed is a non-cardiological consult. The person at Butner, as I understand this record, who determines whether or not a cardiologist needs to be brought in was not a cardiologist. Now, you can argue that's the way it works in the real world. But in the real world, you have a physician who is personally familiar with the person's medical history and can perhaps more reasonably make the determination of whether or not a cardiologist needs to be consulted. And the other thing is, without taking Coumadin levels, how can the non-cardiologist determine whether or not the cardiologist needs to be brought in? Well, the Bureau of Prisons was taking his Coumadin readings. There was some issue as to whether or not they had been every two weeks or exactly what the time frame was. But all in all, even another consulting expert, Dr. Chambers, agreed overall that the Bureau of Prisons had taken care of his Coumadin regimen in an effective manner. And I think the telling point on all this, Your Honor, is that back in August, Mr. Brown was released on bail by Judge Rambo pending his resentencing. He then underwent extensive medical testing by his own physician, his own cardiologist at Hershey. Those tests all found that Mr. Brown was stable. And even his doctor agreed that he was stable and would make no changes whatsoever to what the Bureau of Prisons had prescribed for Mr. Brown for his medications. Beyond that, the government did not present any opposing medical testimony regarding Mr. Brown's condition. We fully accepted his physician's evaluations and recommendations as to what should happen to Mr. Brown in prison. Accepted them in full and complete. The only issue is whether the Bureau of Prisons could meet those needs. And Dr. Ramirez testified that they could. The problem I have with the medical testimony is initially, way back when, you had Dr. Aronoff, Ramirez, and Chambers. And both Ramirez and Chambers were government witnesses. In this case, Chambers changed and said, look, I don't – I think with – after he's now been in jail 65 months, I think that with his health and his deteriorating health condition, I agree with Dr. Aronoff. That should – As far as whether or not he received the most effective medical treatment,  I think he all concluded from that he probably should get no more – he should not be in jail. He should be able to see a new private physician. But again, the one problem with both Dr. Chambers and Dr. Aronoff's perspective is they weren't knowledgeable. They had no knowledge whatsoever as to what the Bureau of Prisons had at Butner. It's ironic because the only doctor who had seen Brown was Chambers. Is that right? And Aronoff, I guess. Chambers never examined Mr. Brown. He'd been brought on as a government consultant in the first sentencing in connection with the first round. And then he was a joint expert for the second sentencing. Both the defense and the government agreed to use Dr. Chambers as a consultant for the second one. Okay. But 35-5-3-A-2-D does require the court to consider whether or not the medical care provided is being provided in the most effective manner. And as I read the testimony, Chambers even said that it was not, that it would be more effective outside. Now, that doesn't necessarily mean that that's what he gets, but the court has to at least explain why she's making these statements given that record. She may not have specifically articulated why she was accepting Dr. Ramirez's testimony in lieu of Dr. Chambers' opinion, but I think it was implicit because neither Dr. Aronoff or Dr. Chambers had any knowledge with respect to medical capabilities. Okay. And she did talk at length about the medical capabilities at Butler. Right. It looks like when you, when the court, again, forgetting the fact that she did not discuss anything at step two, at step three, it looked like, when I look at the transcript, she only discussed two things. One, she discussed what looks like 3553-A-2-D, which is the health, and then she looked as clear as she spent a lot of time on A-6, which is the disparity of sentences. But any of the other arguments, that doesn't look like... There was one other one. There was one other one. She did talk about our request for an additional fine, and she addressed that, and she made findings that number one, Brown's fees were already excessive, and number two, his age didn't permit further employment. That's true. But it also, at the very beginning of her pronouncement of sentence, she made a statement that she had considered the factors set forth in 3553, that said... You know, that doesn't quite get you home. It's what I got. I guess we're one to bring it, man. Been there, done that. All in all, though, Your Honors, I respectfully submit that taking a look at what she said in total, it is clear what she did here, and it is clear for this Court to figure out what she did. She listened to the testimony, she listened to the arguments, and then she decided, in her discretion, not to depart from the guideline range for these reasons, medical and age. But she did grant... What about the parsimony provision? That, I know, it's kind of like the cheated from the force that nobody heard. But we said in Novoselicki, the Supreme Court has said it, wasn't something we came out with, that there has to be some consideration that the sentence given is the least effective sentence to satisfy the means of sentencing. It's really hard to believe, given all of the circumstances addressing Mr. Brown, that something less severe on remand, forgetting even the initial sentence, is an issue that's not before us. Something less severe than this sentence would not have addressed all of her concerns. I think what was... This could have been a life sentence. It could have easily been a life sentence. That perhaps what was motivating the Court here was the recognition that only seven more months incarceration would lead Mr. Brown to a point where he would be eligible for home confinement. And given the fact that he was in good medical health at the time, and had been for the four years, there was a very reasonable and likely possibility that he could complete that sentence in that time period without it. Well, for someone not doing the time, seven months may not seem like much. But for someone behind bars, my guess is seven months is a long time to be in prison. Do you agree that after Pepper, the Court on resentencing must consider post-rehabilitation evidence? We do, Your Honor. But we don't believe it was really raised by the defense in anything but a frivolous manner. The whole focus of this sentencing was on... What do you mean by a frivolous manner? There was only one paragraph in their sentencing memorandum about anything that had anything to do with post-sentencing rehab. And that was a relationship that Mr. Brown had with two other inmates where he served as some sort of tutor or counselor to them. I don't think that's really a substantive basis for a variance. Well, you may say that the evidence is not sufficient for it, but I don't see how you can say it was not raised. Well, then it's frivolous. Maybe that's not the strongest argument. They're not leading with it, but it's not really what I would consider frivolous. What about the de novo issue? What's your feeling on that? Your Honor, I believe, number one, this case is unlike Miller. There was no vacation of an interdependent counter-conviction, so there is no sentencing package issue here. But the holistic issue of Stinson and the way the Supreme Court is looking at that, and just in terms of common sense, and I don't know your background, but I'm assuming you're really experienced at the way a sentencing proceeding comes together, and it really is an interwoven tapestry. And if you change one piece, you may have to change something else in the equation to get a sentence that the judges comfortable with. Well, one point about it is that the defense has really not identified any other substantive issue that they wanted to raise anew. The only thing mentioned in their brief was their attack upon the Court's finding that Mr. Brown's severance letter wasn't backdated when, in fact, the Court found that it was. Well, that issue has forever been resolved with the stipulation that the defense entered into. They agreed in, I believe it was August or September of last year, that the total loss in the case was some $17 million. 12.7 of that had to do with the dollar value of the backdated letters, of which Mr. Brown's was $5 million. And as a very practical matter as well, I know the defense took issue factually with the fact that that letter was backdated. They misread the testimony in that case. Mr. Shepard was not, as you mentioned, trial counsel and was not familiar with it. But the government had... Well, the fact that he's not trial counsel doesn't mean he's not familiar with it, but I understand what you're saying. They made a point about the printer testifying that this letter was generated by me between September and November of 1988. And therefore, there was an opportunity for Mr. Grass to have signed the letter while he was still the Rite Aid chairman later on. But that ignores the big problem with the case, and that is that the letter, which I have a copy of it here, was dated May 6, 1998. This letterhead did not exist on the date indicated, and that was the important part to the jury. That coupled with Martin Grass's secretary testimony who said, I typed this letter up in 2000 after Mr. Grass no longer was CEO. That issue is not there. It's a non-issue. And with the stipulation, it's gone. There's no other issue that they've identified that they really could raise de novo. It's also a two-edged sword because if you win the battle and lose the war, in terms of getting de novo sentencing, the judge hears more and increases the sentence rather than lowers it. The burden might be higher there to eliminate any suggestion or inference that the increased sentence is to penalize him for the appeal, but it's a problem. I note my time is up. Thank you, Your Honors. Thank you. Did you reserve rebuttal? I reserve three minutes. Okay. Thank you. I'd like to use my three minutes to address three misrepresentations just made to the court. First, right out of the box, Judge Ambrose asked Mr. Daniels about the judge's departure motion and said that there ain't no doubt about it. It didn't happen. Mr. Daniel disagreed, but I want to remind the court that in a pleading filed in this court, the government stated in its opposition to our motion for bail, and I'm quoting the government's language, in imposing the new sentence, the district court did not specifically rule on Brown's departure motion. That was an honest assessment. That's what happened. Everybody knows that's what happened. For him to stand up here and say, no, I disagree, there was a function. I think the issue, I think it's clear that she did not rule on it. I think the issue is, can we look at everything in context and see whether, in fact, she did? But you're quite right. She did not rule on it. And I think the answer to that, Your Honor, is no, because it would force this court to guess. I mean, there's just simply no way to divine what would have happened had she dealt with the downward departure motion. We don't know whether she would have been granted additional variance or not. We just don't, and we can speculate that she would not have, but we don't know that. And that's the problem that you have as the appellate court. The second thing that I want to address is that there was some discussion with Mr. Daniel about how long Mr. Brown stayed at Schoolkill. On page 26 of the government's opposition brief filed in this case, they represent that he was transferred to Butner immediately after his hospitalization in January of 2006. That is not true. I have documents here I could show you, but I think it's in the record. He wasn't transferred to Butner until 22 months later. He went back to Schoolkill for- Twenty-two months after 2006, January. After he was hospitalized, he had six months worth of rapid atrial fibrillation. For six months, he kept going to the infirmary, going to the infirmary, and they kept putting him off, putting him off. He finally was hospitalized when Dr. Aronoff wrote a letter saying, hey, this is grossly negligent. It can lead to congestive heart failure, which it did. He had massive edema, which is swelling throughout his body. He was in bad shape. He went to Hershey Medical Center, finally was admitted. They saved his life by shocking his The government would have you believe that they then transferred him to Butner. That didn't happen. That didn't happen for another 22 months. He went back to Schoolkill for the same time period that you would have to gestate an elephant, which is 22 months. Did the treatment change at all upon his return to Schoolkill? Is that in the record? I'm sorry, Your Honor? Did the treatment change at all, his access to a cardiologist when he went back to Schoolkill? No. I would submit that his treatment at Schoolkill, and it did not improve significantly at Butner, by the way. I want to address briefly the Coumadin issue. The record is clear that neither at Schoolkill nor at Butner did they ever properly follow his Coumadin levels. If you read the testimony of their expert on cross-examination and the documents that were admitted, which are the actual documents from his Coumadin regimen, their policy is that when you have a certain level, you've got to retest within a week to two weeks. That routinely went months and months without retesting. And that's what Ramirez testified to. That's correct. That is in the record. So I wanted to make that point very clear, that Mr. Brown has not received sufficient medical care. There was also a question about whether or not Dr. Chambers, who previously testified for the government, was a treating physician. He absolutely was. When he first testified for Mr. Brown, I'm sorry, for the government, at the initial sentencing hearing, he had not met Mr. Brown. When Mr. Brown was admitted to Hershey Medical Center in January 2006, Dr. Chambers was his treating cardiologist for that admission. So Dr. Chambers knows Franklin Brown and did see him when he was admitted to Hershey. And by the way... To Mr. Daniel's point, he may know Brown, but he doesn't know the medical regime of the Federal Bureau of Prisons. Well, that's not true, because both Dr. Chambers and Dr. Aronoff both received five and a half years' worth of medical records produced by the Bureau of Prisons. Both of the defense experts were given all of the medical records from Mr. Brown's five and a half years in prison, both at Schoolkill and at Butner. They reviewed those medical records and reached their opinions as to the quality of care, if you will, based on the medical records. And if you read the testimony, they both, and the letters, and I've cited them in my brief, I've even quoted what they've said, that Mr. Brown never received quality medical care. And both of them said, if he goes back to prison, it's dangerous. He's at an age with a condition that's got... And in fact, Dr. Chambers even stated in his letter that when he first reviewed or looked at Mr. Brown for the government back at the first sentencing in 2004, I believe, that since then, Mr. Brown has developed many more problems, and his medical condition has become much more complex. And that's why Dr. Chambers changed his opinion. And that's in the letter that's in the brief. So... Okay. Thank you. Thank you for allowing me to address this issue. Thank you. We'll take a matter under advisement. And Mr. Shepard, this is not to suggest our opening of this case, because we haven't discussed it. I have no idea what we're going to decide. But in any event, you indicated you would refile your motion for a release on that. I will do that immediately. Okay. Thank you. Thank you.